**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| JAMES FISCHER | |
| --- | --- |
| | **Plaintiff** |
| vs. | |
| DEAN ERIC STIGLITZ, LAURIE ANNE HERBOLDSHEIMER, GOLDEN RULE HONEY, LLC | |
| | **Defendants** |

FILED
IN CLERKS OFFICE

20!b JUN 15 A 10: 47

U.S. DISTRICT COURT
DISTRICT OF MASS.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, James Fischer, for his complaint against Defendants Dean Eric Stiglitz, Laurie Anne Herboldsheimer, and Golden Rule Honey, LLC, avers:

## PRELIMINARY STATEMENT

1. This is an action for trademark infringement, false advertising, right of publicity, unfair competition, and tortious interference with prospective business relations. Plaintiff's name and trademark were repeatedly misappropriated in an ill-advised strategy of promoting Defendants' book, products, and conferences. Defendants falsely claimed that Plaintiff was part of a conspiracy to "suppress" Defendants' poorly-selling book. Defendants sought to profit by repeatedly infringing Plaintiff's rights. Declaratory relief, damages, costs, and fees are sought.

## THE PARTIES

2. Plaintiff James Fischer is a citizen of New York, residing in Manhattan, New York City.

3. Defendant Dean Eric Stiglitz is a Massachusetts citizen, residing at 168 4th St, Leominster, MA 01453, and a manager/partner of Golden Rule Honey, LLC.

4. Defendant Laurie Anne Herboldsheimer is a Massachusetts citizen, residing at 168 4th St, Leominster, MA 01453, and a manager/partner of Golden Rule Honey, LLC.

5. Defendant Golden Rule Honey is a Massachusetts LLC, headquartered at 168 4th St, Leominster, MA 01453.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Defendants per 28 USC §1391(b)(1).

7. This Court has subject matter jurisdiction pursuant to 28 USC §1332 because the amount in
   controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of
   interest and costs, and there is complete diversity of citizenship between Plaintiff and
   Defendants. Venue is also proper in this District pursuant to 28 USC §1391(b)(2) because a
   substantial part of the events giving rise to the claims arose in this District.

## PERSONAL LIABILITY OF DEFENDANTS

8. Defendants Stiglitz and Herboldsheimer are husband and wife, and are the sole shareholders,
   sole officers, and sole employees of their legal fiction and alter-ego, "Golden Rule Honey,
   LLC". Defendants failed to comply with even the most basic of corporate formalities, resulting
   in a "corporation" that has been consistently dissolved for failure to file annual reports
   throughout its corporate history (*see* Exhibit P).

9. Defendants disregarded their corporate entity and used it as a mere instrumentality for the
   transaction of their own business. Their LLC has no identity or existence apart from that of the
   owners, lacking even its own phone number.

10. "Piercing the corporate veil" is not a prerequisite to imposing personal liability upon corporate
    officers for their own torts, or when they are involved in, approve of, or even merely do
    nothing to stop torts committed by their agents or fellow officers.

11. The corporation itself is liable for the torts of agents and employees via Respondeat superior.
    Additionally, the Restatement defines conduct, including an intentional tort, to be within the
    scope of employment when "*actuated, at least in part, by a purpose to serve the [employer],*"
    even if the specific acts themselves are forbidden by the employer. [1]

---

[1] Restatement §§ 228(1)(c), 230; also see *Prosser and Keeton on Torts* § 70, at 505-506.

12. Each Defendant is personally jointly and severally liable for all damages, costs, and fees.

## FACTUAL ALLEGATIONS RELATING TO ALL CAUSES OF ACTION

15. In 2006, press reports that "the bees were dying" prompted hundreds of thousands to begin keeping bees, as bees were the first threatened species that one could "save" in one's own back yard. The interest overwhelmed legitimate beekeeping classes, and inevitably attracted opportunists and carpetbaggers, looking to prey upon the naive. Defendants were such opportunists, flattering a lonely elderly widow to sell what they stole from her to a publisher.

16. In April, 2008, Defendants visited Ms. Dee Lusby, an AZ beekeeper of many decades' experience, and a beloved "eccentric character" in the industry who had attracted a cult-like following among novices due to her implausible claims about the disease and pest resistance of her bees, which she attributed to her unique "management practices". [2]

17. They returned home with a marriage certificate signed by Ms. Lusby [3], an agreement to resell Ms. Lusby's honey under their new brand name, "Golden Rule Honey" [4], and a hard drive containing videos of beekeeping talks by Ms. Lusby and her late husband. Ms. Lusby had trustingly asked them to convert her videos to a more modern format for internet distribution.

18. Rather than converting the videos as promised, Defendants created a website (4/08), an LLC (8/08), and wrote a book based upon the videos, without permission. Ms. Lusby eventually got her hard drive back, but no converted videos. Quoting from her 9/14/15 post to "Yahoo Groups Organic Beekeeper List", which she had founded in 2000:

[2] The scientific consensus credits this disease and pest resistance to all bees in AZ having been Africanized since the 1990s. They're resistant, but *very mean*. (see http://ars.usda.gov/Research/docs.htm?docid=11059&page=6 )

[3] The line between a bee club and a cult is crossed when marriages are performed. (Pima County AZ Vital Records. http://www.agave.cosc.pima.gov/PublicDocs/ query="Herboldsheimer" )

[4] Defendants need Ms. Lusby's honey, as they have no honey of their own to sell. To this day, they sell honey from AZ, VT, and NY, but never have any honey to sell from the MA hives they claim to keep themselves (*see* http://web.archive.org/web/20080401000000\*/http://www.beeuntoothers.com/Honey.html and note the change between 10/08 and 11/08). Clearly, the actual "keeping bees" part of beekeeping is not Defendants' forte.

> "*He's* [Mr. Stiglitz] *the one I sent home to copy my workshops on video on harddrive, sorta and send back to me, and in so doing he wrote* [a] *book fwiw....and year or so ago I finally got the copied harddrive for my computer from him, but so far have not gotten the videos back yet...*" [5]

19. Defendants signed an agreement with Penguin Random House to co-author a book titled "*The Complete Idiots Guide to Beekeeping*" [6], misappropriating Ms. Lusby's original work.

20. The book was published in May, 2010, but sales were profoundly disappointing.

21. Defendants turned to social media for no-cost promotion and advertising aimed at attracting attention and revenue, especially among young novice beekeepers, who both lacked experience with bees and used social media heavily, and would be more receptive to Defendants' unorthodox theories. Defendants were persistent gadflies on multiple online beekeeper forums, where they interjected ads and engaged in attention-seeking behavior.

22. Until 2013, Plaintiff was unaware of the names of Defendants or their book. Plaintiff pollinated apples on a commercial scale, made products for beekeepers since the 1990s, wrote articles for the bee journals in the 2000s, and teaches a free college-level beekeeping course. Plaintiff participates in bee research projects with multiple teams worldwide.

23. On May 17, 2013, Plaintiff's colleague, Dr. David Heaf, a bee researcher in the UK, in an unrelated discussion, [7] sent to Plaintiff what seemed a message promoting a beekeeping book sent in August 2010 to the members-only forum, "Yahoo Groups Organic Beekeepers" (*see* Exhibit A). Plaintiff was initially unsure if this was "British humor", or if Heaf was serious.

24. Plaintiff had not subscribed to that "Yahoo Group" since 2008, and had not heard of the book or the bizarre accusations, but the lasting impression on a colleague gave Plaintiff pause. [8]

---

[5] http://groups.yahoo.com/neo/groups/Organicbeekeepers/conversations/messages/137787

[6] "Complete Idiots Guides" are inexpensive knock-offs of the popular "For Dummies" series of books.

[7] A discussion of "Nestduftwärmebindung", concerning bee pheromones and social hive cohesion

[8] "*A good name is better than riches*" – Sancho Panza in *Don Quixote* Part II Chpt 33

**25.** The misappropriation of Plaintiff's name for purposes of trade, the misuse of Plaintiff's
trademark, and the false statements were all clear attempts to promote the book.

**26.** On May 26, 2013, Plaintiff emailed the source of the advertisement, "deknow@netzero.net",
demanding that the illegal acts cease, and asking for an explanation. There was no reply.

**27.** On June 18th, 2013, in an email to Dr. Heaf, Plaintiff mentioned that he had not received any
reply, and copied that email message to the supposed source of the promotional message,
deknow@netzero.net, a free, "disposable" email address.

**28.** Later on that same day, Defendants replied to Plaintiff's message, admitting that they were
the source of the promotional message, and confirming that it was not a joke or prank by
restating the highly implausible claims made in their original promotional message.

**29.** Defendants did not explain why they had not contacted Plaintiff in the intervening three
years, despite having postured as being so upset, nor did they explain their false/spurious
claims, or offer to settle or resolve the dispute. [9]

**30.** The correspondence of June 18th 2013 was Plaintiff's discovery that the infringement of his
exclusive rights was not some sort of prank, and also served as notice to Defendants that their
infringements of Plaintiff's exclusive rights would not be tolerated.

**31.** Specific errors in the purported email indicated that Defendants had fabricated the email, or
the entire tale, including the fiction of an email "received by their publisher".

**32.** The book presents the dubious and highly speculative approach to animal husbandry espoused
by Ms. Lusby, [10] one not endorsed by any veterinary authority or credentialed researcher.

---

[9] Making such an offer might have mitigated some MA Ch 93A § 11 damages

[10] Where the outright neglect of bees is considered a virtue, and letting hives die is hoped to somehow change the
course of evolution, and produce disease-and-pest tolerant bees over a single human lifetime, evincing a basic lack
of understanding of evolution, genetics, bee breeding, and other wide swaths of science (so-called "Treatment-Free"
beekeeping, similar in many ways to the misguided "Anti-Vaccination" movement, and just as irresponsible).

33. As there is no scientific basis for the books' (Lusby's) claims, and substantial published scientific evidence refuting them, Defendants spun a narrative of a "conspiracy to suppress the truth" including the USDA, the entire scientific community, and business interests.

34. Defendants named Plaintiff as one of the "co-conspirators", as Plaintiff's trademark had good name recognition, and they knew that he would not notice their acts, being preoccupied with helping his wife to recover from traumatic brain injuries she had suffered in a 2008 fall.

35. Plaintiff's assessment of Defendants' motives was further supported by the discovery that Defendants had identically embroiled the name of another beekeeping author, Mr. Peter Borst, in January 2011, claiming that a negative "Amazon.com Review" of the book had been supposedly written by Mr. Borst, but then had been mysteriously deleted (see Exhibit B).

36. Defendants had also falsely named famous author/sportswriter Buzz Bissinger as a co-author in their Amazon.com listing ( see http://archive.is/IgtTr ), and additionally, basketball star LeBron James as a co-author in their Barnes and Noble listing ( see http://archive.is/iBn0Z ), both presumably attempts to gain some strange sort of online "name recognition". It's unclear.

37. As their accusations were transparent attempts by Defendants to rouse a rabble of support for their generally-ignored book, Plaintiff made no public mention of Defendants, their book, or their deeply distressing accusations, as to do so might have given Defendants some of the attention they so desperately sought.

38. Plaintiff's conversation with a longtime friend who was president of Defendants' local beekeeping association for many years revealed that Defendants had taken the club novice class circa 2006, so Defendants' debut as self-proclaimed "experts" and beekeeping book authors was several decades premature. Their arrogance seemed born of ignorance, and their methodical malice toward so many seemed to stem from simple inexperience and hubris.

39. Unbeknownst to Plaintiff, on June 18, 2013, Defendants published a false account of Plaintiff's June 18, 2013 attempt to halt Defendants' misuse of his name and trademark (*see* Exhibit C).

40. Exhibit C, not discovered by Plaintiff until preparing his original complaint in June 2015 [11], was yet another misappropriation of Plaintiff's name and trademark for purposes of trade.

41. In August 2014, a discussion of product shelf life and the proper use of "Fischer's Bee-Quick", a product made by Plaintiff since 1999, took place on the "BeeSource.com" internet forum.

42. After several comments offering individual experiences and opinions, Defendants interjected bizarre, false comments that plainly misappropriated Plaintiff's name to promote their book, the workshops where they proselytize, and their other products and services (*see* Exhibit D). Again, a conspiracy was claimed, with Plaintiff a part of it.

43. In December 2014, Plaintiff was informed of Defendants' August 2014 misuse of his name and trademark by a dealer for Plaintiff's products. [12] Plaintiff's dealer searched, and also found a prior commercial message that also infringed upon Plaintiff's exclusive rights, on permanent display beginning in Dec, 2012 on the same ("BeeSource") internet discussion group (*see* Exhibit E). This was the first that Plaintiff had heard of either promotional message.

44. Plaintiff's dealer was concerned about the impact on sales, as any perceived involvement with Defendants would hurt Plaintiff's sales. Further, falsely painting Plaintiff as adversarial in the extreme, litigious, and unreasonable to the point of acting in what was claimed to be an extortionate manner would directly hurt business. Defendants' advertising messages overtly attempted to dissuade beekeepers from purchasing Plaintiff's products, and dealers from carrying them, while promoting "our book" and "our publisher", as was Defendants' habit.

---

[11] This complaint was originally filed in SDNY on 08/10/2015, where Defendants evaded personal jurisdiction despite extensive and continual business contacts in NY, prompting the filing of this complaint.
[12] "Fischer's Bee-Quick", sold since 1999, and "Fischer's Nectar Detector", sold since 2009.

45. Both the Dec, 2012 and the Aug 2014 promotional messages specifically claimed that Plaintiff had threatened Defendants' publisher and others with threats of legal action, but no such claim was voiced in 2010, or in 2013.

46. This basic inconsistency in Defendants' claims indicated that Defendants were deliberate and methodical in their false statements, as opposed to mistaken, angry, or confused. Further, Defendants engaged in their illegal acts in a clear pattern that correlated with downturns in monthly sales of their book. Each attempt was a callous and dispassionate attempt to generate controversy, and attract attention, to revive dwindling book sales (*see* Exhibit O).

47. Plaintiff contacted each entity that Defendants falsely claimed had been threatened by Plaintiff with legal action, and each readily verified that no threats had been received from Plaintiff, by any party claiming to be Plaintiff, or on Plaintiff's behalf. (*see* Exhibits F – H).

48. Most basic to refuting Defendants' claims was the refutation of Penguin Book's legal dept.

49. As Plaintiff had already demanded that Defendants stop misusing Plaintiff's name and mark and been rebuffed in 2013, and Defendants continue to misuse Plaintiff's name with full knowledge of and reckless disregard for the falsity of their statements to this day. Plaintiff filed first an action in SDNY, and then, on a ruling of a no personal jurisdiction in NY, this action.

## PLAINTIFF'S NAME IS A RESPECTED BRAND NAME

50. While Plaintiff is not a "public figure" by any definition, his name is a respected brand in the small world of beekeeping. His products have been trusted since 1999 by beekeepers worldwide. The name "Fischer" has earned substantial goodwill among beekeepers as a source designation of product quality, reliability, and an unconditional guarantee - "*Your Money's Worth, Or Your Money Back*" as stated on Plaintiff's product packaging.

**DEFENDANTS' INTERCHANGEABLE PSEUDONYMS**

51. The pseudonyms "Deknow" and "Ramona" are shown to be Defendants' self-admitted aliases in Exhibit L. Defendants use these pseudonyms interchangeably, and both sent various promotional messages from the same computer, making it impossible for even them to keep track of who was using which alias where or when (*see* Exhibit M). As one cannot say who wrote which promotional messages, Defendants are joint tortfeasors.

## 1ST CAUSE OF ACTION – TRADEMARK INFRINGEMENT

52. Plaintiff incorporates the preceding statements as if fully set forth herein.

53. Defendants have, in interstate commerce, infringed Plaintiff's trademark, deceiving as to the affiliation, connection, or association of Plaintiff with Defendants' goods and services (*see* Exhibit K), and causing likely consumer confusion as to the origin, sponsorship, or approval of their goods and services, selling Defendants' related products to the same insular customer base as Plaintiff sells his products, violating 15 USC § 1125(a).

54. Defendants' commercial promotion campaigns are on the internet and thus remain on display to this day in all fifty states, and in international locations worldwide.

55. Plaintiff's trademark, "Fischer" has served Plaintiff as a source identifier for his products since 1999 (*see* Exhibit N). The mark has uniquely identified Plaintiff in the international beekeeping market. Through decades of continuous use, Plaintiff has established exclusive trademark rights in his surname "Fischer" for a wide range of beekeeping products.

56. Defendants' unauthorized misuse of Plaintiff's mark is an attempt to deceive as to the affiliation, connection, or association of Plaintiff with their book, products, and services.

57. Defendants' misuse of Plaintiff's mark is overtly intended to cause both initial interest confusion and consumer confusion. Plaintiff and Defendants sell to the same vertical market.

**58.** Defendants' acts have been at all times willful, knowing, persistent, and deliberate.

**59.** As a direct and proximate result of Defendants' acts, the value of Plaintiff's mark has been, and continues to be, damaged. The attempt to connect Plaintiff's mark with Defendants and their wild tales of intrigue directly damages Plaintiff's ability to use his mark on his products as an indicator of quality, ethical behavior, or integrity, all essential values to beekeepers. [13]

## 2ND CAUSE OF ACTION – FALSE ADVERTISING

**60.** In addition to and separate from the infringement cited above, Defendants made specific false statements in their promotional messages, intended to trade off Plaintiff's reputation and brand-name recognition by embroiling his goodwill in ersatz controversy.

**61.** The claims were intended to deceive, and did – Defendants thanked those deceived (*see* Exhibit A). As a direct result, purchasing decisions were influenced. Those deceived would buy Defendants' book, and eschew Plaintiff's products, both sold in interstate commerce.

**62.** Plaintiff was, is, and will continue to be injured by Defendants' acts. Their false advertising overtly states that people should not do business with Plaintiff.

**63.** Defendants' false claims remain on display to this day worldwide in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**64.** While Defendants' every word was false, significant falsifiable claims can be summarized as:

   a) That Plaintiff intimidated via threats of legal action, disproved by Exhibits F-H
   b) That Plaintiff caused any online archives to be purged, disproved by Exhibits I-J
   c) That Plaintiff disagreed with Defendants over their (stolen) ideas, when Plaintiff has never even mentioned Defendants or their book in public

## 3RD CAUSE OF ACTION – RIGHT OF PUBLICITY VIOLATIONS

**65.** Plaintiff incorporates the preceding statements as if fully set forth herein.

**66.** Defendants' actions alleged herein constitute violations of Mass laws Ch 214 §3A,

---

[13] Beekeeping has been often defined as the art of doing the right and ethical thing, even though no one is watching.

intentionally and knowingly misusing Plaintiff's surname without permission in the state of
Massachusetts for purposes of trade, to promote and sell their book, products, and services.

67. Plaintiff prohibits the commercial use of his name or likeness by all but his authorized
dealers, who have strictly nominative use rights. Plaintiff has exclusive rights in the
commercial use of his surname, separate from his exclusive rights in his trademark.

68. Defendants knowingly misappropriated Plaintiff's surname without consent, and the use was
intended solely to promote Defendants' business interests at Plaintiff's expense.

69. Defendants were put on notice that they had no permission to use Plaintiff's surname for
purposes of trade when Plaintiff corresponded with them in 2013, yet they persisted.

70. In this regard, Defendants attempted to profit from misusing Plaintiff's surname to make
their book seem somehow "controversial" or "important", when it was neither.

71. As Defendants' fabrications had no basis in reality, there was no "newsworthy" element or
"matter of public interest" raised by Defendant in their purely commercial promotions.

72. Perversely, claiming opposition from well-known names in the "beekeeping establishment",
such as Plaintiff, Borst, and others would act as an "endorsement", attracting interest of the
book's apparent target demographic of conspiracy theorists and technophobes. [14]

73. Defendants openly admitted to their deliberate fabrication of controversy embroiling
Plaintiff, and the purely commercial purposes behind their fabrications as early as 2010,
saying: "*Yes, controversy is good, but the publisher* [of our book] *must stay aware that there
is a market for this particular controversy.*" (*see* Exhibit A, last page)

[14] The alleged conspiracy centers on Bayer CropScience. Monsanto, Syngenta, and their presumed influence on
researchers. Pesticides, herbicides, and GMOs are blamed for problems clearly caused by imported diseases and
pests. Plaintiff and his colleagues have waited in vain for a chance to "sell out" to wealthy shadowy interests, but no
one ever calls, so we crestfallenly continue to apply for miniscule grants and stipends to support our research.

74. Defendants' acts are thereby shown to be willful, deliberate, and in conscious disregard of Plaintiff's exclusive rights under Ch 214 §3A.

## 4TH CAUSE OF ACTION – UNFAIR COMPETITION

75. Defendants' multiple infringements of Plaintiff's exclusive rights, and their overt deception of prospective dealers and customers in the tiny beekeeping industry constitute Unfair Competition and Deceptive Practices per MA Law Chapter 93A § 11.

76. Defendants unfairly exploited and infringed upon Plaintiff's valuable goodwill and his intellectual property to promote and sell their own products and services, directly damaging Plaintiff's intellectual property, goodwill, reputation in the marketplace, and sales.

77. Defendants' acts had or "*may have the effect of causing such loss of money or property*". [15]

78. As Defendants persisted after being ordered to cease, and even after suit was filed, Defendants' acts were at all times willful, knowing, and deliberate. Defendants' acts occurred in MA.

79. Defendants' acts violate every possible definition of conventional business ethical standards. There simply is no possible excuse or explanation for such behavior. Plaintiff has never even laid eyes on Defendants, and did not even know their names until discovering their illegal acts.

## 5TH CAUSE OF ACTION - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

80. Plaintiff incorporates the preceding statements as if fully set forth herein.

81. Plaintiff cultivates and maintains many long-term profitable business relationships. Additional dealers in new locations and new customers are important to Plaintiff.

82. Defendants knew of those relationships and intentionally interfered with them via the independent torts of infringing Plaintiff's trademark, violating his right of publicity, and false advertising, resulting in economic injury to Plaintiff from 2010 to present.

---

[15] Mass General Law Chpt 93A § 11

**83.** Defendants' deliberate interference injured Plaintiff's prospective relationships. as

Defendants specifically lied, proposing that no one should do business with Plaintiff, saying:

*"If someone from a company being rude on the phone is relevant to the product (it is), then the inexplicably toxic actions of the person with their name on the bottle are certainly relevant." (see* Exhibit D)

**84.** Defendants' interference with Plaintiff's prospective contract rights and economic advantage

was based upon Defendant's other culpable and independently tortious conduct.

**85.** By reason of the foregoing, Defendants have tortiously interfered with Plaintiff's

prospective economic advantage and have damaged Plaintiff's business growth.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that this court enter judgment as follows:

(a) For Trademark Infringement, awarding Plaintiff (i) injunctive relief; and (ii) the amount of

Defendants' profits resulting from unlawful conduct;

(b) For infringing Plaintiff's Right of Publicity, awarding Plaintiff (i) injunctive relief; (ii)

damages for injuries sustained from Defendants' unlawful actions; (iii) exemplary and

punitive damages for willful, wanton, deliberate conduct; and (iv) Plaintiff's fees and costs;

(c) For False Advertising, (i) injunctive relief, including removal of all false advertising from

view at Defendants' sole expense; (ii) Defendants profits; and (iii) Damages for harm to

Plaintiff's goodwill, in an amount to be determined at trial; and (iv) Plaintiff's fees and costs;

(d) For Unfair Competition, awarding Plaintiff (i) injunctive relief; (ii) damages; (iii) treble

damages for willful conduct; and (iv) Plaintiff's fees and costs;

(e) For Tortious Interference with Prospective Economic Advantage, awarding Plaintiff (i)

compensatory damages in an amount to be determined at trial and (ii) punitive damages for

Defendants' malicious interference;

**(f)** Permanently enjoining Defendants, and their agents, officers, employees, successors and assigns and all others acting in concert or privity, from using, imitating, or copying Plaintiff's name, picture, image, or likeness for purposes of trade in any media, in any form;

**(g)** Enjoining repetition of the specific statements adjudged to be false/deceptive advertising, as they are part of a continuing course of tortious conduct, and the repeated false claims have been consistently narrow and specific;

**(h)** Ordering Defendants to immediately and at their own expense remove all misuses of Plaintiff's name, trademark, and all false advertising from all web-sites and other places where they have place such promotional statements, and/or to compel their removal utilizing TOS and DMCA complaints filed by licensed attorneys and follow-up prosecution under the DMCA as required, again at Defendants' sole expense;

**(i)** Ordering Defendants to, at their own expense, prepare and execute written agreements assigning sole copyright interest to Plaintiff for each and every misuse of Plaintiff's name and false advertising statement made to facilitate future DMCA enforcement; and

**(j)** Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff hereby respectfully demands a trial

by jury of all issues triable of right by a jury.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2016

James Fischer
*Plaintiff Pro Se*
PO Box 287048
New York, NY 10128
917-628-4052
james.fischer@gmail.com