United States District Court, D. Massachusetts

| | |
|---|---|
| JAMES FISCHER<br>                    Plaintiff<br>vs.<br><br>DEAN ERIC STIGLITZ,<br>LAURIE ANNE HERBOLDSHEIMER,<br>GOLDEN RULE HONEY, LLC<br>                    Defendants | Case 16cv40076-TSH<br><br>**Plaintiff's Reply to Defendants'<br>Motion To Dismiss** |

Defendants attempt to contradict the Complaint, and to reinterpret the Complaint in a tortured manner that is clearly not "viewing the facts set forth in the complaint in the light most favorable to the plaintiff". These will be addressed after the only actual argument advanced.

Defendants attempt a "First Amendment" defense for false commercial speech. They claim that their methodical multi-year ad campaign is not advertising, not promotion, not "commercial speech" at all.

Falsity is not a complex issue. *"For commercial speech to come within the First Amendment, it at least must concern lawful activity and not be misleading"*.[1] But "commercial speech" is far less consistently defined. Plaintiff's started with *Valentine,*[2] and read notable cases through to *Alvarez.*[3] The essential distinguishing factor common to all cases seems to Plaintiff to be the ability to see <u>the economic motive behind the speech.</u> If there is an economic motive, then the speech is commercial in nature.

In prior pleadings, Defendants claimed some prior disagreement or animosity between the parties, posturing that this justified Defendants' falsities as "criticism" of Plaintiff. These claims are notably absent from their most recent pleading, as the assertions were false. The parties have

---

[1] Central Hudson, 447 U.S. at 566
[2] Valentine v. Chrestensen, 316 U.S. 52 (1942)
[3] United States v. Alvarez, 567 U.S. (2012)

never even laid eyes on each other. The sudden disappearance of the excuse emphasizes

Defendants' deliberate commercial advertising and promotion as driven by purely economic

motives.  They even explicitly explained their planned advertising campaign in 2010 (Complaint

¶75), and consistently executed that exact plan, fabricating and disseminating false tales of

"scandal" to promote their book, products, and services.  Their only possible motive is profit.

The falsity of Defendants' highly specific and oft-repeated statements, the wide distribution to

prospective customers via multiple social media platforms specific to beekeepers, and the lack of

any possible motivation other than profit all support the conclusion that Defendants were

advertising and promoting and engaging in commercial speech.   When the same essential

message is repeated over and over, interrupting unrelated subject matter in different channels of

communication by someone with things to sell, it's an ad.

While Defendants attempt to misclassify their false advertising as "discussion of beekeeping

methods", the specific falsities have nothing to do with beekeeping.  Plaintiff focuses his

complaint on the falsities of "threats of litigation". These allegations are plainly false even if

everything Defendants claim might somehow be true.  Each entity supposedly threatened has

denied receiving any hint of a threat.  Clearly, threatening all and sundry with litigation would be

unacceptable business practices in the peaceable and quiet community of beekeepers. While this

is not as extreme an allegation as "*Proctor & Gamble supports the Church of Satan*", the distaste

for contracts and attorneys among beekeepers is so intense, and their preference of "handshake

deals" and verbal agreements is so strong as to make the two accusations roughly equivalent to

beekeepers.

**Defendants' Ad Campaign Is Familiar**

Plaintiff turned off his web-browser ad-blocker for a few minutes, and quickly collected similar

"postings" in social media "forums" shown in Appendix A.  These ads are identical in style,

intent, and tone to Defendants' ads, and clarify classification of Defendants' commercial ads as such. Despite Defendants' protestations to the contrary, their ads follow a familiar formula, using text, rather than images to achieve the same end.

The sheer amount of Defendants' social media activity is evidence that that Defendants' use of social media is commercial and promotional. Why else would any couple with goods and services to sell spend so much time and effort writing solely for a specific audience of beekeepers? This is not mere attention-seeking or vanity, as would be the case with excessive Facebook or Instagram posting, this was targeted marketing to a very specific demographic. Defendants seem to have spent more time promoting their business interests than they spent on any aspect of working at those business interests, revealing that promotional activity was a significant part of their business.  This is no surprise, as Defendants merely sell honey produced by others, and sell content plagiarized from others, so "sales and marketing" is all they do.

**The Defendants' Promotion and Advertising of Their Book and Related Items**

Defendants sought notoriety for their plagiarized book. Falsely promoting and advertising "opposition" and "suppression" from well-known names in the industry falsely implied that their book, products, and services were worthy of attention and discussion.

As the Complaint states, the work was plagiarized from the Lusbys, well-reviewed over 20 years before Defendants saw their first beehive (see *Beekeeping on the Fringe, with Ed & Dee Lusby*" by Kim Flottum, "Bee Culture" magazine 01/1998 [4], and the Lusbys' persistent Letters to the Editor of "American Bee Journal" from the 1990s onward).

By implying that Plaintiff would dignify plagiarists by "debating" with Defendants, or even by mentioning their book or "conferences", Defendants sought a false imprimatur of "legitimacy".

---

[4] Available at http://resistantbees.com/blog/?page_id=927 and elsewhere

Issues of "scientific proof" and "ideas" are irrelevant distractions here.  Defendants plagiarized a well-known and well-loved eccentric character, and beekeeping is a refuge where eccentrics are cherished and affectionately valued.

Plaintiff was not even aware he was being embroiled by Defendants in their manufactured "scandal" for several years.  But even after discovering Defendants' illegal acts, neither Plaintiff nor anyone else listed in Amended Complaint ¶97 ever publicly mentioned Defendants or their plagiarism. They pointedly ignored Defendants' book and services as party guests overlook a dog's defecation on the dance floor, saying nothing, and avoiding stepping anywhere near it.

But Defendants did what the Avon distributor did in *P&G v. Haugen* – falsely accusing Plaintiff of doing such evil, that the immediate reaction of those who saw the 2010 ads was strong:

> "*He sells a product that goes against this groups' charter*", "*He sells chemicals used in beehives*", "*Last time I checked, I was not living in Cuba or China*", "*Fischer is seriously trying to get* [Defendants' book] *off the market*", "*…being lied to by people like Jim Fischer, EXXON, DuPont, Monsanto, GE…*", "*I quickly ordered your book*", "*I hope your publisher doesn't suspend shipment of this book*", "*Can I order directly from you?*"

and that's just the reaction to the <u>*first*</u> of at least 9 ads uncovered so far, more likely to be found.

Plaintiff clearly "*is or is likely to be damaged by*" Defendants' misrepresentations, and the reactions to Defendants' falsities are clear proof of actual confusion and lost sales, not mere "likely confusion*".*  The injury, both actual and potential, is clear.  Misled customers will buy Defendants' products and services, and will never buy Plaintiff's directly-competing products and services. Further, they are likely to spread the false rumors to others, doing further damage to Plaintiff revenues and his brand.

Defendants attempt to misconstrue, so the specific types of trademark infringement engaged in by Defendants include, first "False Association / False Endorsement":

> 15 USC §1125(a)(1) *Any person who, on or in connection with any goods or services… uses in commerce any… false or misleading description of fact, or false or misleading*

*representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person…*

In the promotion/advertising of Defendants' book, goods, and services, Defendants repeatedly used falsities to cause confusion about the ***"connection, or association" of Defendants with Plaintiff***. The truth was that there was no connection between the parties at all, but Defendants painted Plaintiff as working to "suppress" their book and related services.

And second, False Advertising:

*(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.*

(Defendants falsely claimed that threats of lawsuits were made by Plaintiff, misrepresenting Plaintiffs' commercial activities, and misrepresented the nature of their goods, misusing the names and reputations of other well-known writers, educators, and authorities in the beekeeping community as "oppressors", and, bizarrely even exploited the name-recognition of two basketball celebrities listing them as co-authors, a "characteristic" of their book.)

All this sold Defendants' book, products, and services, each directly competing with Plaintiff's book, products and service offerings.

**False Association Impugns Plaintiff Products/Services/Brand to Multiple Beekeeper Segments**

While it is clear that Defendants' falsities harmed Plaintiff's brand reputation among the "treatment-free" beekeepers who were most likely to believe in the tales of conspiracy, the false claims of scandal also harmed the brand among "traditional", "conventional", and "organic" beekeepers, who would view any interaction with conspiracy-theorists negatively, even if to only engage them in debate. So, just as in *Dallas Cowboys v. Pussycat Cinema,* [5] association of Plaintiff in any way with Defendants results in confusion which has *"a tendency to impugn*

---

[5] *Dallas Cowboys, etc  v. Pussycat Cinema*, Ltd., 604 F. 2d 200 - Court of Appeals, 2nd Circuit 1979

*plaintiff's services and injure plaintiff's business reputation"* [6]. Prohibitions against false association are intended not just to prevent consumer confusion but also to protect "*the synonymous right of a trademark owner to control his product's reputation.*" [7]  Plaintiff worked for decades to create a professional brand held in high regard and free from controversy.

**Advertising, Promotion, and Commercial Speech**

In *Jordan v. Jewel* [8], a page in a commemorative basketball yearbook was no less advertising and false association if it was complementary to Jordan.  Being congratulatory did not change the fact of false association in *Jordan*, and neither does being uncomplimentary, as in this case. Tone is immaterial.

Jewel's ad served to enhance Jewel's brand by associating itself with Jordan in the minds of basketball fans and Chicago consumers. The court had no trouble answering the question, "*What does [the ad] invite the readers to buy?*" The answer: "*Whatever they need from a grocery store.*" In essence, it found that "brand advertising" isn't any less commercial than ads for specific products, as its "*commercial nature is readily apparent*" and it "*aimed at promoting goodwill for the Jewel-Osco brand*" [9] by exploiting Jordan's name-recognition.

In this case, we not only have commercial advertising and promotion, we have immediate and direct reactions involving purchases of Defendants' book:  in Exhibit B, John Anderson cites the retail price of Defendants' book, and summarizes it (Ex B pg 7), Egeels asks "*Can I order* [your book] *directly from you?*" (Ex B pg 10).  The exhibits also include consistent mentions of Defendants' workshops, conferences, book, publisher, and even their honey in their advertising.

---

[6] Id.
[7] James Burroughs Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 274 (7th Cir. 1976)
[8] Jordan v. Jewel Food Stores, Inc., 743 F. 3d 509 - Court of Appeals, 7th Circuit 201
[9] Id.

*P&G v. Haugen* [10] presents a much closer equivalent to the case at hand than the print-ad case *Jordan v. Jewel.* The *Haugen* messages, distributed as audio [11] by an electronic system to a small number of Amway distributors, mentioned no specific Amway products at all, and suggested that the Amway distributors eschew P&G products, something that they would clearly already tend to do. The claim that P&G was connected to Satanism was misrepresentation of P&G's "commercial activities" under the Lanham Act. So, "proposing a transaction" clearly includes proposing NOT buying any P&G products, even to salespeople who already make a living selling against P&G, and would never buy P&G products, as they buy Amway products wholesale. Product references were irrelevant – the commercial intent was to spread rumors so that those hearing it would spread it further as they sold and "evangelized" Amway products. The courts are in agreement, that "*the* [Lanham] *Act's reach is far broader than merely a `classic advertising campaign.'*" [12]  In *Gordon & Breach*, the court summed up the principles found in the case law and the Act's legislative history of the Lanham Act as follows:

> *"commercial advertising or promotion" under Section 43(a)(1)(B)... must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.*

*Lexmark* [13] has replaced (2) above with "zone of interests". Parties need not be competitors. (3) is far broader than stated above, and includes, as in *P&G*, other "pitches", such as the eschewing of products or an entire brand. The "commercial speech" is best illustrated by the undeniable

---

[10] *Procter & Gamble Co. v. Haugen*, 2008 WL 2736875 (D. Utah)

[11] Transcribed in a 5th Circuit case, 242 F.3d 539

[12] *Gordon & Breach*, 859 F.Supp. at 1534 (citing cases). Also see *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803-04 (7th Cir.2001); *Seven-Up*, 86 F.3d at 1384

[13] Lexmark International, Inc. v. Static Control Components, Inc. 572 U. S. (2014)

economic motive for Defendants' ads and the falsities.  The relevant purchasers are thousands of beekeepers who see the ads.

*Romeo & Juliette*, [14]  *Imagine Medispa*, [15] and *AvePoint* [16] are similar to this case. Falsities about commercial activities of a competitor were spread via social media in "guerilla advertising" by unethical marketers.  In each case, the falsity of the statements were key to determinations of commerciality, materiality, causality, and illegality.

**Point-By-Point Rebuttals To Defendants' Memorandum**

A mark-up of Defendants' motion is attached as Appendix B.  The numbers below correspond to numbers in the margins.  Many arguments are not even appropriate to a motion to dismiss.

1) False association and false advertising are "trademark infringement", not abandonment of it.

2) No claims are alleged as to either individual - Defendants are joint tortfeasors.  The repeated protests that only one defendant is responsible are curious.

3) To be "discussions", some would be started by someone other than Defendants.  But all ads/"discussions" are started/provoked by Defendants.  This is a significant factor leading to the conclusion that this is advertising and promotion.  The falsity of the specific statements is another.  The fact that Plaintiff was not the only such target is yet another.  Defendants strive to misinterpret a simple false endorsement/false association claim.

4) The false advertising claim addresses falsities about Plaintiff's commercial activities, and also addresses the misrepresentations about those other than Plaintiff, as they were made in promoting and advertising Defendants' products and services.

5) Only falsities are of concern here.  Merely "controversial" statements would not be actionable.  In fact, the aura of "controversial" is what Defendants attempted to create.

6) The relationships are clearly specified - "sales to dealers and beekeeper customers"

7) "Exchanges" is just as misleading a term as "Discussions" in (3) - Defendants advertised widely to people they did not know, provoking reactions, and then following up with "more detail" in response to ***any reply.***  In a few cases, no reply was forthcoming, so Defendants

---

[14] Romeo & Juliette Laser Hair Removal Inc. v. Assara I LLC, Dist. Court, SD New York 2016
[15] Imagine Medispa, v. Transformations, 999 F. Supp. 2d 873 (SD WV 2014)
[16] AvePoint v. Power Tools 981 F. Supp. 2d 496 (WD VA 2013)

followed up with more detail in reply to their bait not taken.  The only "exchange" in these cases was between Defendants and themselves!  This insistence on delivering the second half of the ad even when no one "took the bait" is telling evidence that the "troll and explain" approach was deliberate planned advertising, not spontaneous honest discussion.

**8)**  Again, Defendants are clearly defined as joint tortfeasors.

**9)**  In ¶26, ironic quotes were used to describe how Defendants portrayed their plagiarized work to further their claim of being somehow "repressed by the establishment".

**10)** The "events" described in the 2010 ad are defined in the Complaint as entirely fictional creations of Defendants, proven by the implausible nature of the story they tell.  They are not relatable as facts, as they are merely part of an unsubstantiated story told by Defendants.

**11)** Defendants' attempt to present their false advertising as if it were fact can be ignored - Defendants' initial ad in Exhibit A is presented in the Complaint as Defendants' fabrication, written solely and entirely by Defendants.

**12)** A false statement - the letter-writing campaign was to be addressed to Defendants, not the publisher.  "jf@beeuntoothers.com" was an email account created by defendants on their own domain.  Later, Defendants excused the lack of any reply from the publisher's rep as some sort of technical failure.  But if they knew of the problem, why not correct it, and forward the publisher's replies to those who took the time to write letters?  The simple answer is that there were no publisher replies because no one except Defendants saw the emails, as no employee of the Publisher had anything to do with Defendant's outré promotional campaign. The entire story was a lie.

Further, Penguin very aggressively protects their authors and works from even the most obscure slight, for example a blogger clearly poking fun:

http://thereformedbroker.com/2012/11/28/retraction-re-antifragile-parody/

And even high-profile artists are not immune from similar overreaching bullying:

http://theguardian.com/books/2014/mar/02/artist-ladybird-book-penguin-copyright-miriam-elia

The only conclusion one can draw is that Penguin never got any letter of the sort claimed by Defendants, as they would have been just as aggressive toward the purported letter-writer as they are toward anyone who even merely satirizes their books in perfectly legal ways.

**13)** Not discussions.  See (7) above.

14) It is Defendants' products and services that are referenced, as they are what Defendants promote and advertise.  As in *P&G v. Haugen*, mentions of Plaintiff's products are immaterial when the falsities are about Plaintiff's commercial activities.

15) The Aug 2014 "troll" was so insulting, Defendants offered the excuse "Because it was funny".  But the next reply to the response to their trolling repeated the same highly specific falsities regarding litigiousness.  The "defamatory" aspects of the "troll" or "bait" message were simply not worth the trouble of arguing a NY State defamation claim, and it was clear from the Court's comments that the defamation claim seemed duplicative of the Right of Publicity and False Endorsement claims.

16) The August 2014 ads do mention "our publisher", which clearly is a mention of the "Guide" to the audience who had by then been inundated with tens of thousands of Defendants' prior mentions of their book, their conferences, etc.

17) Plaintiff will not repeat the clear difference between the more liberal interpretation of pro se pleadings as opposed to those drafted and researched by professionals, and the many cases which make this clear.  Twombly and Iqbal are distinguishable as complex conspiracy cases.

18) Defendants ignore Plaintiff's actual claim of **false association**, that Defendants' ads created confusion as to Plaintiffs "*affiliation, connection, or association*" with Defendants themselves and their wild claims of a vast conspiracy against them.  Defendants clearly promote their products, services and "brand" by claiming that they are embattled, so the "endorsement" is "Fischer hates our book".

19) False association is shown by the reviling of Plaintiff by customers in the Exhibits, proving that potential customers were specifically confused as to Plaintiff's association with Defendants' goods and services, when Plaintiff was not merely unassociated, but was completely unaware of even the existence of Defendants, their products, or their services.

20) Defendants' falsities in their ads clearly associated Plaintiff with the trumped-up scandal they attempted to create around their book and services.  "Affiliation" is not the issue, nor is the term in the statute.

21) The "James Fischer" email was clearly written by Defendants, so it is one of their falsities.

22) Defendants' posturing as "embattled", with Plaintiff painted as one of their tormentors deceived many.  As in *P&G v. Haugen*, there is no requirement that false association and false advertising be in the form of a glowing product endorsement.

23) As show in Exhibit A, the claim that a product is "hated" by one authority figure or another is a very common advertising and marketing tactic.  When the claim made is false, then the Lanham Act applies, as it protects consumers from advertiser misrepresentations, and

protects brands from the corrosive effects of misrepresentations.  Of course such a cause of action exists – Plaintiff cites several such cases in this document.

**24)**  The factors are clearly met (1) Falsities have been clearly pointed out; (2) the material nature of the misrepresentations is shown by Defendants being asked questions like "*Can I order directly from you?*" in reply to the misrepresentations; (3) the actual deception is shown by the reviling of Plaintiff in immediate reaction to the falsities; (4) Defendants advertised on the internet, which is plainly interstate commerce; and (5) Plaintiff has been injured by the specific purchase of Defendants book and services, rather than his own, and the severe negative impact on his brand evinced by statements like "*…being lied to by people like Jim Fischer, EXXON, DuPont, Monsanto, GE…*" Plaintiff's brand reputation is built on the completely natural and organic products and services he sells to beekeepers actively producing legitimate USDA-Certified Organic honey under the USDA National Organic Program, and to other beekeepers who cannot meet the stringent USDA criteria, but instead sell honey "Produced Using Organic Methods".

**25)** Defendants both fabricated the entire "story of the dispute" and the specific crimes and misdemeanors they claimed to have been committed against them.  Every independent party has firmly contradicted each and every one of Defendants claims.  Defendants lied, over and over, about every allegation they made.  The truth is that no one did any of the things Defendants claim in their ads and promotions.

**26)** There was no email to "forge".  The entire story is highly implausible and self-contradictory, and there is only evidence to contradict, not support it. Defendants may not attempt to introduce their own lies into evidence as if they were anything more than lies, and the Complaint clearly identifies the statements and claims as lies.

**27)** *Vascular Sols.,* has nothing to do with this case.  MTP did not identify a set of claimed-false statements in their counterclaim so as to provide "requisite notice required under FRCP 8(a). In this case, Plaintiff has clearly stated that Defendants every word in regard to him is not just false, but proven false by specific refutations made by independent parties.  Sufficient numbers of Defendants' statements have been presented to provide clear notice.

**28)**  *Kirtz v. Wells* is another inapposite citation – that Court ruled that an amended complaint was in order, the ruling being before widespread news reports of "robo-signed" fraudulent mortgage assignments, which led to Wells Fargo's confession of guilt in the $25 billion mortgage industry settlement of 2012 with US regulators.  But it is a very different thing to allege forgery of an "official mortgage document" (the "MERS assignments").  In this case, we have an advertisement containing a purported email addressed to an unnamed party, with multiple glaring inaccuracies showing that it was fabricated.  Regardless, the Complaint clearly states that the email is a fabrication of Defendants, and the Complaint clearly states that all representations of Defendants concerning Plaintiff are lies.  Defendants attempt to contradict the Complaint in a motion to dismiss.

**29)** Repeatedly failing to cite *Lexmark v. Static Control* in regard to "competitor" is a failure to acknowledge binding adverse precedent. This violates FRCP 11, breaches Model Rule 3.3, and a is violation of the Duty of Candor to the Tribunal. This seems sanctionable. [17]  (2) is also stated far more narrowly in the citation than the actual criteria, for example, the speaker need not sell his goods, he may suggest that one eschew the goods of another, as in *P&G*.

**30)** The fact that the advertisements directly resulted in sales ("*Can I order directly from you?*" Ex B) is undeniable proof that Defendants' denials do not change the utility of their ads as advertising.  *Gordon & Breech,* from which the criteria are taken, clearly states "[T]*he representations need not be made in a '*classic advertising campaign*', but may consist instead of more informal types of 'promotion'…*" [18]

**31)** *Gentle Wind Project* is distinguished from this case by the completely non-commercial efforts of the Defendants to expose the non-profit Gentle Wind Project as a cult via a website of first-hand accounts of former members of the group.  As the cult did not sell anything, and the Defendants did not sell anything either, the Court rightly noted the distinct lack of any hint of commercial activity.  Here, we have nothing but commerce.

**32)** *Encompass v. Giampa* is distinguished from this case by the ruling itself "*Encompass, an insurance company, is not in competition with any of the defendants, all of whom are providers of chiropractic services.*" (at 311).  While *Lexmark* has since broadened "competition" to "zones of interests" and "proximate causation", the press releases at issue were also privileged – they were unvarnished reports about the outcome of litigation.

**33)** Not only are commercial transactions proposed, prices are quoted, dates and places of conventions and workshops are announced, and sales are directly mentioned in immediate reply to Defendants by the customers confused by their lies and misrepresentations. Defendants can squirm and wiggle all they wish, but when their efforts directly result in sales, this is undeniable proof that they were selling, and selling effectively.

**34)** When any/all mention of beekeeping methodology is crossed out of Defendants' ads, what is left are the lies about Plaintiff's business practices, and the falsely-alleged acts of "persecution" of Defendants by others.  If a court can distinguish religious speech from false advertising in *P&G v. Haugen*, separating beekeeping from false advertising here is easier.

**35)** Defendants' ads offer no "beekeeping ideas" or "methods". There are only false claims of suppression and conspiracy against them and their products and services. Defendants wish to point to their thousands of other promotional statements, but their beekeeping-related materials does not make false statements about Plaintiff or others, so they are of no interest

---

[17] Jorgenson v. County of Volusia, 846 F.2d 1350, 1351-52 (11th Cir. 1988)
[18] Gordon & Breach, 859 F.Supp.

here.  Defendants First Amendment rights end at the tip of Plaintiff's nose, and Defendants' repeatedly pummeled Plaintiff's brand with deliberate, knowingly false allegations.

36) Defendants again do not credit the Court with the intelligence to regulate false advertising while not censoring unrelated commentary about beekeeping.  Only the falsities need be addressed here, as falsity is the key element that separates Defendants promotional statements from their chatter that is irrelevant to this case.  Given the verbosity of Defendants on social media, one cannot seriously claim that removal of specific false advertising would in any way limit their free expression, as there are tens of thousands of expressions, and the overwhelming majority are not related to this litigation in any way.

37) *Oxycal Labs* is distinguished from this case in that an entire book, sold for $20 a copy, is a product in its own right, not an advertisement.  But Defendants seem to think the Court is incapable of telling a book from an ad, or distinguishing an ad from a blog post.

38) The falsity of the statements made by Defendants is the key factor that Defendants attempt to blur here.  "Expressions of lawful speech" are not at issue here, only speech that is regulated because it is false advertising is at issue.  The Court is more than capable of enforcing the Lanham Act without violating Defendants' right of expression in unrelated speech found to be neither false nor commercial.   Plaintiff has been very narrow and specific in his claims, so as to focus only on falsities that are clearly false on their face, and thereby avoid infringing on Defendants' right of expression.

39) Defendants alone attempted to create the impression of "controversy".  This is not irrelevant, this is one of the primary "message" of Defendants' advertising and promotion. See Appendix A.  The claim *We Are Controversial*" is Defendants' most basic false claim, and all their violations of the Lanham Act are falsities intended to create that impression.  So, this is not Plaintiff's allegation, and Defendants have painted themselves into a corner here, amusingly arguing with their own assertions.

40) Again, the promotion *We Are Controversial*" was the reason why Defendants lied, saying that many notable beekeepers, Plaintiff among them, "opposed" Defendants ideas.  Even with all the information he has gathered, the only possible observation Plaintiff might make is that Defendants seem to be plagiarists, so the "ideas" or "methodologies" Defendants wish to defend as free speech are nothing more than stolen goods that Defendants wish to resell. A comparison of Defendants' book with the Lusby's videos would likely yield a rich trove of copyright infringement claims.  Such stolen speech is not protected by the First Amendment, it is instead punishable under the Copyright act.

41) Defendants need not mention Fischer's products in their false advertising about Plaintiff's commercial activities, they need only be advertising/promoting <u>their own</u> products/services.

**42)** Again, the "satire" was yet another outrageous statement, intended to provoke a response, similar to the other "clickbait" ads in Appendix A.  Had the satire been the ONLY statement made by Defendants, then it would not be actionable at all, but the follow-up statement [19] showed the commercial intent behind even the supposed "satire".  None the less, the Court is perfectly capable of drawing a line, and leaving the "satire" standing as a monument to free speech while still prohibiting the false advertising in the follow-up statement.

**43)**  Defendants' oft-repeated falsities echo *P&G v Haugen* perfectly, and for example, the August 2014 false advertising, quoted in Complaint ¶131, clearly and unambiguously urges the eschewing of Plaintiff's products.  The overt promotion of Defendants' book as (yet again) embattled is in the sentence before, see Exhibit H.  But misrepresentation about commercial activities need not mention Plaintiff's products at all, the ad may instead only mention Defendants' products and services, or only mention either party's brand.  *Jordan v. Jewell* and other similar cases show that references to brands alone suffice to violate the Lanham Act.  P&G had such a difficult time because they did not initially allege that the false advertising was concerning P&G's *commercial activities*, which emphasizes the difference between falsities about products/services and those about *commercial activities*.  Either way, Defendants did not "criticize" Plaintiff, they lied about specific commercial activities that never took place.

**44)** Again, Defendants express a low opinion of the ability of this Court to enforce the Lanham Act without contravening the First Amendment.  There is a reason why the First Amendment comes first, and Plaintiff has confidence that Defendants' clear violations of the Lanham Act can be addressed just as prior cases have been addressed without constitutional violations.

**45)** One need look no further than ¶131 and Exhibit H to see Defendants' own claim that their false accusations are material to purchasing decisions. In that context, "*relevant to the product*" clearly means "relevant to the customer decision to purchase the product".  But there is no need to allege any reference to an "*inherent quality or characteristic of Fischer's goods and services*" as goods and services are not what is lied about – what is lied about is Plaintiff's *commercial activities*.

**46)** Readers DID ask to purchase Defendants book in direct reaction to the falsities presented by Defendants.  See Exhibit B.  Multiple statements implied that readers were "predisposed to purchase from Defendants" as a direct result of their falsities.

**47)** The actual harm to Plaintiff is clear.  His brand is openly and repeatedly reviled in direct reaction to Defendants' falsities, again Exhibit B is the clearest evidence of how damaging these falsities were.  Impact on sales, in terms of increased sales to Defendants that might otherwise have purchased Plaintiff's products and services, is a factual issue for discovery.  An accounting of specific actual damages is not generally attached to a complaint.

---

[19] "The REST of the Story", as coined by Paul Harvey in his famous radio spots.

**48)** The "injuries to others" are merely false advertising where falsities about the acts of others, rather than about Plaintiff himself, sell and promote Defendants product services and brand. Plaintiff has standing, as sales made via falsities are sales that are "stolen" from Plaintiff. Further, Defendants' promotions damage Plaintiff's brand as Defendants link his brand to a vast conspiracy of scientists, industry leaders, and regulatory authorities.

**49)**  Complaint ¶55 clearly lists the directly-competing products and services of Plaintiff and Defendants.  While *Lexmark* eliminated the need for the parties to be competitors, it should be clear that one can choose between the two sets of competing products, and that falsities about Plaintiff's commercial activities enhance Defendants' stature via the imprimatur of Plaintiff's name-brand recognition and directly sell Defendants' products, while causing Plaintiff to both lose a sale and suffer the harm of having his brand associated in any way with Defendants.

**50)** Defendants deny the commercial nature of their misuse of Plaintiff's name, and also claim that their commercial use of Plaintiff's name is incidental.  Both arguments are refuted by the Defendants' many distinct and separate misuses, and the highly specific nature of the misuse. Plaintiff's name was clearly used to catch attention, as the name has good name-recognition within the relevant target market, per Complaint ¶50.  Plaintiff's name was used much like the ads in Exhibit A to provoke interest, and prompt questions, and thereby give Defendants an opening to make their sales pitch. In each and every case, Defendants are the only ones to bring up Plaintiff's name in their "clickbait" advertising.  No one else starts any discussion about Plaintiff as a person.  The misuse cannot be incidental when it is repeated over and over using similar wording, just like a commercial aired multiple times.  The repetition alone shows the intent and the deliberate commercial nature of the exploitation.

**51)** Defendants attempt to confuse interference with specific ***contracts*** with the far more broad tort of interference with ***prospective economic advantage***.  The best analysis Plaintiff could find to compare the two torts is in *Wal-Mart Stores, Inc. v. Sturges*, 52 SW 3d 711 - Texas Supreme Court 2001.  It says:

> "*we treat tortious interference with prospective business relations differently than tortious interference with contract. It makes sense to require a defendant who induces a breach of contract to show some justification or privilege for depriving another of benefits to which the agreement entitled him. But when two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in his pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable.*"

So, through the independent torts of false advertising and false endorsement, Defendants' competitive actions crossed the line into tortious interference with prospective business relations, and the clear result of their torts was to convince nearly the entire "Treatment Free"

community that Plaintiff's products should be shunned. This community is far larger than the legitimate USDA Organic-Certified beekeepers, as there are no Federal regulations to comply with to call oneself "Treatment Free". Plaintiff's Bee-Quick product is made at high cost from only organic materials, and is even distilled and bottled entirely with solar energy rather than using energy that might pollute. These features would only be most highly valued by beekeepers who aspire to higher than "conventional standards".

It is clearly alleged that Defendants were "aware" of Plaintiff's customers. Defendants specially and directly addressed both Plaintiff's dealers and potential customers in widely-circulated ads multiple times. In the most glaring examples they falsely claimed that Plaintiff has a history of threatening litigation, which needs no explanation as a valid reason to eschew a wholesale "dealer/retailer" relationship with Plaintiff, and is a very good reason alone for customers to not purchase products at retail from Plaintiff. The specific impact on specific customers are clearly shown in the exhibits, and these customers are representative of a much broader group.

52) Defendants' assertion that the "underlying claims fail" is presumptuous, but the assertion that Plaintiff must be located in, and injured in Massachusetts is flatly wrong. Defendants certainly claim to have committed their acts in Massachusetts, and Plaintiff's products are sold in Massachusetts, but more important, Defendants profited from their illegal acts in Massachusetts. *Back Bay Farm* is a case where a horse buyer traveled to Virginia, bought a horse, and trucked the horse back to Massachusetts. The entire transaction took place outside Massachusetts.

53) Defendant's passing reference to Rule 10(c) at the bottom of Page 2 of their motion is an implication that Plaintiff may not cite, for example, 400-page online discussion threads as a whole without burdening the court with a paper copy of the entire saga. This assertion is refuted by simply reading one of their cited cases, *Kirtz v. Wells Fargo*:

> *The Court may consider* [documents not attached] *discussed infra without converting the motion to dismiss into a motion for summary judgment because it is a public record. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (noting that although a court resolving a motion to dismiss brought under Rule 12(b)(6) is ordinarily prohibited from looking beyond the four corners of a complaint without converting the motion to dismiss into a Rule 56 motion for summary judgment, courts have recognized "exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint").* [20]

In oral argument, the Court stated that some of the lengthy materials had been reviewed, but that the Court could not take the time to read all of such lengthy documents. The Court also refused Plaintiff's request to submit excerpts containing reactions to Defendants advertising

---

[20] Kirtz v. Wells Fargo Bank N. A., 2012 WL 5989705, at *10 (D. Mass.)

for the Court's consideration.  This was the sole reason for drafting the Amended Complaint at issue here.

Plaintiff has taken care to sufficiently refer to and to overtly cite these online materials in the complaint by expressly listing them by URL.  As they are clearly in the public domain, and they are not disputed as to their authenticity, both parties can utilize the fully body of evidence for the case.  Plaintiff hopes that the Court will agree with *Kirtz v. Wells Fargo*, as the alternative would be yet another Amended Complaint with a massive and unwieldy stack of undifferentiated sheets of paper as the "Exhibits".

Defendants do not want the full record to be available, as the facts do not support any of Defendants' contentions.

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system, and trust that it will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF).

Pursuant to the provisions of 28 USC 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY

May 4, 2017

James Fischer
Plaintiff
Box 287048
New York, NY 10128
917-629-4052 (cell)
jamesfischer@gmail.com

**Dermatologists Hate Her!**



She is **51**
Looks **25**

Local mom exposes shocking
anti-aging secret. Learn the
$5 trick to her stunning results.

LEARN THE TRUTH NOW

BIOLOGISTS HATE HIM!



GROW NUTRIENT DENSE FOOD WITH
THIS ONE WEIRD OLD TRICK!

**Language Professors Hate Him!**



Doctor's discovery revealed
the secret to speaking any
language in just 10 days.
Watch this shocking video
and discover how you can
rapidly learn any language
in just 10 days using this
sneaky linguistic secret...
Free from the computer...
Free from memorization...
and absolutely guaranteed!

Click to Watch
Video Now

Pimsleur Approach

DOCTORS *HATE* HIM



HE BEAT THE SYSTEM USING ONE
*WEIRD* TRICK

FIND OUT HOW   Click here 

55/YO Mom Looks 35



Mom Reveals
Shocking Trick
for Erasing
Wrinkles!
Doctors Hate
Her.



Sacramento 53/YO Mom
reveals simple Wrinkle trick
that has angered doctors



**Power Companies HATE This!**



Energy companies are scared that people will learn how to produce Free Electricity for their homes using this unique device.



**Spammers Hate Him**

**One Weird Trick to reducing Spam by over 90%**

**(Hint, it's not what you think it is)**

**Power Companies HATE This !**



Energy companies are scared that people will learn to produce Free Electricity for their homes using this unique device.





UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JAMES FISCHER

　　　　　Plaintiff,

v.

DEAN ERIC STIGLITZ, LAURIE
ANNE HERBOLDSHEIMER,
GOLDEN RULE HONEY, LLC

　　　　　Defendant.

CIVIL ACTION NO.  4:16cv40076-TSH

MEMORANDUM IN SUPPORT OF RENEWED MOTION TO DISMISS

INTRODUCTION

The Plaintiff, James Fischer, restyles his complaint by abandoning claims of trademark **1**

infringement and breaking out claims under 15 U.S.C. § 1125(a) into three separate causes of

action for false association/endorsement, false advertising of the Defendants' goods and services,

and "false advertising regarding Plaintiff's commercial activities".  No new factual allegations

are asserted, and the Amended Complaint does not correct the deficiencies when rendered the

original complaint subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  The Amended

Complaint still does not allege facts to support a legal claim of relief, and should be dismissed as

to all defendants.  Additionally, the Amended Complaint should be dismissed as to Laurie Anne **2**

Herboldsheimer for failure to set forth any allegations as to her individually.

<u>PROCEDURAL HISTORY</u>

In 2015 Fischer commenced <u>Fischer v. Eric Stiglitz, Laurie Ann Herboldsheimer, and</u>

<u>Golden Rule Honey, LLC</u> in the Southern District of New York, Case No. 15cv6266-AJN.  That

action was dismissed due to lack of jurisdiction over the defendants.  On June 15, 2016, Fischer

filed <u>James Fischer v. Dean Eric Stiglitz, Laurie Ann Herboldsheimer, and Golden Rule Honey,</u>

<u>LLC</u>, Case No. 4:16-CV-40076-PCH.  The defendant filed a motion for judgment on the

pleadings seeking dismissal, which Fischer opposed.  Following the December 14, 2016 hearing

on the motion for judgment on the pleadings, Fischer sought leave to amend the complaint,

which was granted.

<u>THE ALLEGATIONS</u>

The first cause of action asserted alleges liability under 15USC §1125(a)(1)(A) based on

the references to Fischer in internet discussions.  The second and third causes of action allege      **3**

that the Defendants are liable under 15 USC 1225(a)(1)(B) based on statements that Fischer      **4**

threatened litigation against the Defendants and others, as well as unspecified statements deemed      **5**

controversial.  An unnumbered cause of action based on G.L.c. 214 §3A alleges a commercial

use of Fischer's name.  The fourth cause of action asserts liability under G. L. c. 93A §11 based

on unspecified exploitation of "Plaintiff's valuable good will and his intellectual property."  The

final cause of action, tortious interference with prospective economic alleges injury to      **6**

unspecified business relationships.

The factual allegations for consideration by the court are based on online exchanges      **7**

between Defendant, Dean Eric Stiglitz, and members of the Organic Beekeepers Discussion

Group and the BeeSource Forum, attached to the Complaint as Exhibits A through J. Complaint

¶ 23.  See, Rule 10(c) (a complaint consists of the allegations contained therein and written

instruments made exhibits to the pleadings) .No relevant posting is alleged to have been made by

other defendants.

**8**

In 2010 the Defendants published a book entitled <u>The Complete Idiot's Guide To</u>

<u>Beekeeping</u> (hereafter the Guide), which Fischer alleges contained "unorthodox theories" to

which "younger and novice beekeepers, who lacked experience with bees" might be receptive.

**9**

¶26.  On May 17, 2013, Fischer allegedly learned of a posting by Stiglitz to the Organic

Beekeepers group dated August 18, 2010, which incorporated an email from "James Fischer"

claiming to be "the executive director of the largest beekeeping cooperative in the USA, the

Gotham City Honey Co-Op, based in NYC".  The "James Fischer" email was severely critical of

the "treatment free" and "small cell" approaches set out in in the Guide, called Stiglitz an

"opportunist", referenced studies purporting to "firmly refute" the Guide, and informed the

publisher of the need for revisions to "add appropriate disclaimers and qualifications to the text."

Ex. A.  The August 18, 2010 posting asked for comments as to the credibility of the "James

Fischer" email and requested that the Organic Beekeepers group communicate with the publisher

in support of the Guide and its content.Exhibit B reflects the exchanges among the Organic

Beekeepers group on this issue.

**10**

**11**

**12**

Exhibits C through I reflect online discussions of beekeeping studies, methodology and

practices, which Fischer characterizes as advertising and "trolling". ¶¶ 42-48.  The allegedly

false statements in the postings concern negative reviews of the Guide generally and attempts by

Fischer to recall the Guide through threats of litigation, with no reference to Fischer's products

or services.   The only factual reference to a Fischer product is found in August 2014 exchanges

on the BeeSource-com forum, Ex. H, in which Stiglitz made satirical comments on a forum

thread discussing "Fischer's Bee-Quick", and which Fischer recognized as such in withdrawing a

**13**

**14**

**15**

defamation count in the New York Action. (Case No. 15cv6266-AJN, ECF 24).   The August

2014 postings do not mention the Guide.                                                              **16**

ARGUMENT

A complaint, even if filed by a pro se litigant, must allege a plausible entitlement to relief

to survive dismissal.  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 559 (2007); <u>Gooley v.</u>

<u>Mobil Oil Corp.</u>, 851 F.2d 513 at 514 (1988). (pro se complaints require factual allegations to

support material elements of a legal theory).   To assess plausibility, argument and legal

conclusions, even if couched as fact, are first weeded out and only the remaining non-conclusory

factual allegations are presumed true. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009); <u>Ocasio-Hernandez</u>

<u>v. Fortuno-Burset</u>, 640 F.3d 1, 10-12 (1st Cir. 2011).   A claim is facially plausible only if its

factual content allows the court, using judicial experience and common sense, to draw a

reasonable inference that the defendant is liable for the alleged misconduct. <u>Iqbal</u>, 556 U.S. 678-

679, citing <u>Twombly</u>, 550 U.S. at 570.  The plausibility standard is not met by pleading facts that

are merely consistent with a theory of liability. <u>Id</u>.                                              **17**

A.  <u>15 U.S.C 1125(a)(1)(A).</u>

15 U.S.C.A. § 1125(a)(1)(A) makes liable "(a)ny person who ... uses in commerce any

word, term [or] name ... which … is likely to cause confusion, or to cause mistake, or to deceive

as to the affiliation, connection, or association of such person with another person, or …

sponsorship, or approval of his or her goods, services, or commercial activities by another

person".  To survive dismissal Fischer's claim for relief under this section requires factual

allegations of conduct that creates a likelihood of confusion among potential purchasers

regarding his sponsorship or approval of a product or service offered by the Defendants.  Fischer  **18**

alleges no facts to support such an affiliation. <u>Compare</u>, <u>Gronk Nation, LLC v. Sully's Tees,</u>  **19**

4

LLC, 37 F. Supp. 3d 495, 498 (D. Mass. 2014)(defendant's use of GRONK on t-shirts created a

likelihood of confusion that the Plaintiffs were associated with or approved the Defendants'

merchandise. ).  No reference to Fischer in the complained-of postings could possibly confuse **20**

online participants as to Fischer's affiliation with the Defendants.  The "James Fischer" email

incorporated into the August 18, 2010 posting maligned Stiglitz as an opportunist, and the Guide **21**

as misleading.  Other references to Fischer reflect only his disapproval of the Defendants and the

Guide,do not give the impression that Fischer endorses such goods and services.  Fischer **22**

attempts to weave allegations of threats of litigation and opposition by "well-known names in the

'beekeeping establishment'" into a cause of action based on "likely consumer confusion as to

Plaintiff's dis-approval" of the Defendant's products and services. ¶¶ 58-91.  No such cause of **23**

action exists.  No facts that would support a claim under Section 1225(a)(1)(A) are alleged, and

this count should be dismissed.

## B.   15 U.S.C §1125(a)(1)(B).

Section 1225(a)(1)(B) prohibits false and misleading descriptions of products and

services in interstate commerce and "was designed to protect consumers and competitors from

any duplicitous advertising or packaging which results in unfair competition." Cashmere &

Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310 (1st Cir.2002).   The elements of a **24**

false advertising claim are that (1) the defendant made a false or misleading description of fact or

representation of fact in a commercial advertisement about his own or another's product; (2) the

misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the

misrepresentation actually deceives or has the tendency to deceive a substantial segment of its

audience; (4) the defendant placed the false or misleading statement in interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by

direct diversion of sales or by a lessening of goodwill associated with its products.  Id. At 310-311. The allegations as to Stiglitz's statements fail to support the elements necessary to support a claim for false advertising, and both the second and third counts of the Amended Complaint should be dismissed.

Fischer's allegations are opaque, but the main thrust of his second and third causes of action appears to be that the dispute between the Defendants and others as to beekeeping **25** practices created an air of controversy that benefited the Defendants products and services, and that the statements concerning threats of litigation misrepresented the nature and quality of Fischer's commercial activities.  The factual allegations are insufficient to the first element.  The generalized allegations of falsity, as well as the allegation that the "James Fischer" email was **26** forged, must be disregarded, Vascular Sols., Inc. v. Marine Polymer Techs., Inc., 2008 WL **27** 763277, at *1 (D. Mass. Mar. 19, 2008) (allegation that plaintiff "misbranded and disseminated false and misleading information" insufficient to encompass a Lanham Act claim); Kirtz v. Wells **28** Fargo Bank N. A., 2012 WL 5989705, at *10 (D. Mass.) (allegations that assignment was forged was a legal conclusion).

Nor does the Amended Complaint adequately allege that the Stiglitz statements are constitute "commercial advertising or promotion. " Podiatrist Ass'n, Inc. v. La Cruz Azul De P.R., Inc., 332 F.3d 6, 19 (1st Cir.2003).  The four-part test to determine which representations constitute "commercial advertising or promotion" is whether (1) the representation constituted commercial speech; (2) made with the intent to influence potential customers to purchase the speaker's goods or services; (3) by a speaker who is a competitor of the plaintiff in some line of **29** trade or commerce; and (4) disseminated to the public in a manner that constitutes advertising or promotion. Encompass Ins. Co. of MA v. Giampa, 522 F. Supp. 2d 300, 311 (D. Mass. 2007)

The failure to allege factual support for any of these elements is fatal to a claim for false advertising . Id.  Fischer's characterizations of Stiglitz's online comments as advertisements or promotions, even though couched as fact, do not satisfy this four-part test and must be disregarded.  Iqbal, 556 U.S. 662, 678, Gentle Wind Project, 2004 WL 1946448, at *5 (allegations that defendants made false statements "in commercial advertising or promotion" deemed conclusory); Encompass Ins. Co. of MA v. Giampa, at 311(same).

**30**

**31**

**32**

The online postings are not commercial speech.  They do not do not propose a commercial transaction.  No factual allegation is made that the postings promote a particular product or service of the Defendants, or are designed to induce a prospective purchaser to buy their goods and services.  Rather, the statements reflected in the exhibits relate to beekeeping methodology and represent expressions of ideas which are protected by the First Amendment. The Guide and the Defendants' online discussions promulgate treatment free beekeeping. Whether or not those theories may lack scientific foundation or be controversial is beside the point.  Removal of the online discussions as sought by Fischer would suppress that message.

**33**

**34**

**35**

**36**

Speech does necessarily become unprotected because of an economic motive.  Books and online commentary uniquely intertwine ideas and financial considerations, absent which few books would be published and few blogs posted.  See, Oxycal Labs., Inc. v. Jeffers, 909 F. Supp. 719, 724, 726 (S.D. Cal. 1995)  Even if the pled facts are consistent both with a theory of liability predicated on Section 1225(a), which the Defendants deny, they also represent expressions of lawful speech, and thus fail the plausibility test.  Iqbal, 556 U.S. 678-679, Twombly, 550 U.S. at 570.

**37**

**38**

The allegation that Defendants' products and services are portrayed as "controversial" is both conclusory and irrelevant.  Controversial theories, like "mainstream" theories, enjoy First

**39**

Amendment protection, no matter what form they take.  Fischer's premise that the "controversial" nature of the alleged statements somehow promoted the Defendants' products and services lacks plausibility.

**40**

Fischer inadequately alleges misrepresentations as to his commercial activities such as would support his third cause of action.  The posts about which Fischer complains do not mention Fischer's products in a commercial advertising or promotional context, and the single reference to a Fischer product in a discussion of any kind was satire.  While the Amended Complaint equates Fischer's name with his products and services, and alleges that his "brand name" has been damaged as a result of the "ads", ¶¶ 50-51, Fischer, the person, is not the same as Fischer's goods and services, or the commercial activities in which he engages.  Section 1225(a)(1)(B) is concerned with the latter, and not the former.  The postings which criticize Fischer do not implicate Section 1225(a)(1)(B).  Compare, Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1275 (10th Cir. 2000) in which the allegations that the plaintiff contributed its profits to the Church of Satan, and unambiguously urged message recipients to eschew purchasing the plaintiff's products in favor of its own, provided the necessary nexus between the defendants' statements and the plaintiff's commercial activities.  Fischer did not assert a defamation claim in the New York action, and does not do so here. (ECF 24, opposition to motion for judgment on the pleadings, p.2).  Followed to its logical conclusion, any critical reference to Fischer would be prohibited.  The purpose of the Lanham Act is the prevention of deceptive advertising, not automatic censorship.

**41**

**42**

**43**

**44**

Fischer does not adequately allege materiality.  There is no allegation that the alleged statements relate to an inherent quality or characteristic of Fischer's goods and services, or how they were likely to influence purchasing decisions.  See, Cashmere, 284 F.3d at 311-312.  No

**45**

reader of the online discussions would be predisposed to purchase the Defendants' products or services because of statements that Fischer was threatening litigation.

**46**

Lastly, Fischer has not alleged why or how any of the Defendants' alleged statements caused any actual harm.  Conclusory allegations of harm couched as fact do not suffice, nor do generalized and conclusory claims of injuries to others which Plaintiff has no standing to assert.

**47**

**48**

United States v. AVX Corp., 962 F.2d 108, 115-116 (1st Cir. 1992) at 115–16.  Although Fischer alleges to be a competitor of the Defendants, he does not allege what product customers would have purchased, but did not, because of the alleged statements.

**49**

In short, the Amended Complaint fails to adequately allege the needed elements of a false advertising claim. Both the second and third causes of action should be dismissed.

### C.      G.L. c. 214, §3A (Right of Publicity Violations).

G. L. 214, §3A provides in pertinent part:

> Any person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action in the superior court against the person so using his name, portrait or picture, to prevent and restrain the use thereof; and may recover damages for any injuries sustained by reason of such use. If the defendant shall have knowingly used such person's name, portrait or picture in such manner as is prohibited or unlawful, the court, in its discretion, may award the plaintiff treble the amount of the damages sustained by him.

Liability under G.L. c. 214, §3A is determined, not when "the defendant makes an incidental use of the plaintiff's name, portrait or picture (but when) the defendant uses the plaintiff's name, portrait or picture deliberately to exploit its value for advertising or trade purposes." Tropeano v. Atlantic Monthly Co., 379 Mass. 745, 749 (1980).  The factual allegations are inadequate to as to deliberate exploitation for commercial purposes, and an incidental use does not give rise to liability.  The fact that the Defendant sell products and

services related to beekeeping from which they hopefully make a profit does not turn the use of Fischer's name into a commercial use.  Id.  This count must also be dismissed.

**50**

### D.  Tortious interference with prospective economic advantage.

The elements of this tort are (1) a business relationship or contemplated contract of economic benefit; (2) the Defendants' knowledge of such relationship; (3) the Defendants' intentional and malicious interference with it; and (4) loss of that advantage as a direct result of the defendant's conduct.  Comey v. Hill, 387 Mass. 11 (1982).  Fischer does not allege that the Defendants were aware of his customers, nor does he allege facts sufficient to infer intent to damage relations with those customers.  The statement quoted in part in Paragraph 131 of the Amended Complaint is opinion and not fact, and Exhibit H from which it comes reflects that it was an attempt at humor to which the forum participants little attention.

**51**

Fischer fails to identify a specific opportunity that was lost.  A potential market for a product without more is insufficient to create a prospective advantageous relationship with each potential customer in that market.  In Laser Labs, Inc. v. ETL Testing Labs., Inc., 29 F. Supp. 2d 21, 23–24 (D. Mass. 1998), "general inquiries in response to a mass mailing" were found not to create the "prospective business relationship" sufficient to satisfy the first element of this tort.  Fischer does not allege that, apart from the Defendants' knowledge of his products, they were aware of a specific opportunity, that they employed improper means to interfere with that opportunity, or that Fischer was harmed thereby, Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 38–39 (2004).  Dismissal is appropriate.

**52**

### E.  G.L. c. 93A, §11.

Fischer's claim under G.L.c.93A, §11 derives from his claims under 15 USC 1225(a) and his state claims of interference with prospective advantageous economic advantage and G.L. c.

214 §3A. Since those claims fail, the Chapter 93A claim fails.  Chapter 93A requires a showing

of conduct that (1) falls within 'the penumbra of some common-law, statutory, or other

established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3)

causes substantial injury.  <u>Jasty v. Wright Medical Technology, Inc.</u>, 528 F.3d 28, 37 (1st Cir.

2008)(citations omitted).  Because the underlying claims fail, Fischer cannot show that the

Defendants' conduct fell within any common-law, statutory, or other established concept of

unfairness. <u>Id.</u>

Fischer's Section 11 claim remains jurisdictionally deficient.  G.L. c. 93A, §11 provides:

> No action shall be brought or maintained under this section unless the
> actions and transactions constituting the alleged unfair method of competition or
> the unfair or deceptive act or practice occurred primarily and substantially within
> the commonwealth. For the purposes of this paragraph, the burden of proof shall
> be upon the person claiming that such transactions and actions did not occur
> primarily and substantially within the commonwealth.

For a complaint premised on Section 11 liability to proceed at the very least an allegation

that the plaintiff is located, and claims an injury, in Massachusetts is necessary.  <u>Back Bay Farm,</u>

<u>LLC v. Collucio</u>, 230 F.Supp.2d 176, 188 (D. Mass. 2002).  Fischer alleges that he is a resident

of New York and Virginia.  No factual allegation connects the alleged harm to Massachusetts.

Where the jurisdictional requirements are not met, Fischer's Section 11 claim must be dismissed.

## CONCLUSION

Fischer's complaint fails to state a claim for which relief can be granted.  For the above

reasons, Defendants request that it be dismissed with prejudice.

Defendants,
Dean Eric Stiglitz, Laurie Anne
Herboldsheimer, Golden Rule
Honey, LLC
By their attorney,